# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PHYLLIS M. HARBOUR,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00020 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Phyllis M. Harbour, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) (West 2003 & Supp. 2007). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

Case 2:07-cv-00020-JPJ-PMS   Document 17   Filed 05/27/08   Page 1 of 30   Pageid#: 71

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Harbour protectively filed her applications for SSI and DIB on August 31, 2004, alleging disability as of September 21, 2002, due to arthritis in both feet.[1] (Record, ("R."), at 53-54, 109.) The claims were denied initially and upon reconsideration. (R. at 27-29, 32, 33-35.) She then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on February 22, 2006, at which Harbour was represented by counsel. (R. at 36, 220-37.)

By decision dated June 21, 2006, the ALJ denied Harbour's claims. (R. at 15-21.) The ALJ found that Harbour met the disability insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 17.) The ALJ found that Harbour had not engaged in substantial gainful activity at any time relevant to his decision. (R. at 17.) The ALJ found that the medical evidence established that Harbour had a severe impairment, namely arthritis, but he found that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1. (R. at 17-18.) The ALJ found that Harbour had the residual functional capacity to perform

---

[1]Neither Harbour's DIB nor her SSI application is contained in the administrative record. Only a form entitled "Amendments To Application" is included for the court's review. (R. at 53-54.)

-2-

sedentary work,[2] diminished by an ability to stand/walk for only two hours in an eight-hour day and an inability to crouch, climb or drive. (R. at 19.) Thus, he found that Harbour was unable to perform any of her past relevant work. (R. at 19.) Based on Harbour's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Harbour could perform, including those of a telemarketer and an order clerk. (R. at 19-20.) Thus, the ALJ concluded that Harbour was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 20-21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

After the ALJ issued his decision, Harbour pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 5-8.) Harbour then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Harbour's motion for summary judgment filed September 28, 2007, and the Commissioner's motion for summary judgment filed October 31, 2007.

## II. Facts

Harbour was born in 1958, which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007). (R. at 62.) She has a high school education with training in computers. (R. at 114, 223.) Harbour has past work experience as a laborer and sander in a furniture factory. (R.

---

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2007).

at 110, 223-24.)  Harbour testified that she quit working due to ankle pain.  (R. at 224.)  She stated that she underwent surgery in 1992, and the possibility of another surgery on her left ankle was being discussed.  (R. at 224.)  She stated that she had begun to have difficulty with her right ankle as well.  (R. at 225.)  Harbour testified that she could stand and/or walk for 15 minutes without interruption.  (R. at 225.)  She stated that she needed to elevate her legs at all times.  (R. at 225.)  Harbour testified that her pain affected her memory.  (R. at 226.)  She stated that she sometimes read and that she watched a lot of television.  (R. at 226.)  Harbour testified that she had difficulty walking, climbing stairs and lifting and carrying objects.  (R. at 228-29.)  She estimated that she could lift and carry items weighing up to five pounds.  (R. at 229.)  Harbour testified that she had received cortisone injections in her ankles, but that her doctor would not administer any more.  (R. at 229.)

Harbour testified that she had been seeing a psychiatrist for approximately two years.  (R. at 227.)  She stated that her pain caused her "nerves" to worsen.  (R. at 227.)  Specifically, she stated that she was very nervous and could not concentrate.  (R. at 227.) Harbour testified that she experienced crying spells daily.  (R. at 228.)  She stated that her mother and her brother helped her clean her house and took her to the grocery store.  (R. at 228.)

Gerald K. Wells, a vocational expert, also was present and testified at Harbour's hearing.  (R. at 229-37.)  Wells classified Harbour's past relevant work as a sander in a furniture factory as light[3] and unskilled.  (R. at 230.)  Wells was asked to consider

_____

[3]Light work involves lifting items weighing up to 20 pounds at a time with occasional lifting and carrying of items weighing up to 10 pounds.  If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

-4-

a hypothetical individual of Harbour's age, education and work history who was restricted as set forth in Dr. Peterson's November 16, 2004, evaluation. (R. at 230.) Wells testified that such an individual could not perform Harbour's past work as a furniture sander. (R. at 231.) However, Wells testified that such an individual could perform the light job of a desk clerk at a motel or hotel, the sedentary job of a cashier, the light job of a file clerk and a telemarketer at the sedentary level of exertion. (R. at 231-32, 234.) Wells was next asked to consider the same individual, but who also could not perform complex work and could not work in stressful situations. (R. at 232.) Wells testified that such an individual could not perform the portion of the telemarketing jobs previously identified that were related to sales. (R. at 232.) However, Wells testified that such an individual could perform the sedentary job of an inbound telemarketer, which existed in significant numbers in the national economy. (R. at 232-33.) Wells further testified that sedentary jobs might accommodate an individual to elevate the legs below waist level, but not to waist level. (R. at 235.) Wells next was asked, notwithstanding the elevation of the legs, whether an individual who had difficulty dealing with people could perform the jobs previously enumerated. (R. at 235.) Wells testified that such an individual could perform the inbound telemarketing jobs. (R. at 236.)

In rendering his decision, the ALJ reviewed records from Dr. D.B. Tucker, M.D.; Dr. Jon T. Peterson, M.D.; Richard J. Milan Jr., Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Piedmont Community Services; Dr. Edward Eller, M.D.; Piedmont Foot Center; and Dr. P.C. Patel, M.D., a psychiatrist.

-5-

On December 30, 2003, Harbour saw Dr. D.B. Tucker, M.D., with complaints of pain and swelling in the left ankle. (R. at 120, 176.) It was noted that she had a calcaneal navicular bar that was resected approximately 12 years previously, and that Harbour continued to have a peroneal spastic flat foot joint. (R. at 120, 176.) Harbour did not want any x-rays taken because she lacked insurance, so Dr. Tucker only examined her foot. (R. at 120, 176.) Harbour had palpable pedal pulses. (R. at 120, 176.) A neurological examination was essentially within normal limits except for decreased reflexes in the left lower extremity. (R. at 120, 176.) Dr. Tucker diagnosed severe subtalar joint arthritis with splinting of the subtalar joint. (R. at 120, 176.) He advised Harbour to stay off of the foot as much as possible and informed her that at some point she would likely need to undergo a subtalar joint fusion. (R. at 120, 176.)

On November 16, 2004, Harbour saw Dr. Jon T. Peterson, M.D., at the request of the Virginia Department of Rehabilitative Services, for an evaluation of bilateral foot impairments. (R. at 121-23.) Harbour exhibited a full range of motion of all extremities except the ankles. (R. at 122.) An examination of the ankles revealed bilateral arthritic deformities, left greater than the right. (R. at 122.) Dr. Peterson noted that Harbour had flat feet and that there was a valgus deformity at the ankles, left greater than the right. (R. at 122.) Range of motion was essentially normal on the right and limited on the left. (R. at 122.) No edema was noted, and Harbour's neurovascular status was intact. (R. at 122.) Harbour could walk slowly with a slight limp, and no apparent muscle wasting was noted. (R. at 122.) Dr. Peterson doubted that Harbour was giving her best effort during gait testing. (R. at 122.) He opined that she could sit for eight hours a day, stand without difficulty for two hours a day and walk for two hours a day with normal breaks. (R. at 122.) Dr. Peterson noted that

-6-

Harbour required special shoe orthotics and would have difficulty walking on uneven terrain, but could be expected to walk short distances of less than 20 yards occasionally as part of her work. (R. at 122.) He opined that she could carry items weighing up to 10 pounds and that she could bend and stoop, but could not crouch due to difficulty moving her left ankle. (R. at 122.) Dr. Peterson opined that Harbour could reach, handle, feel, grasp and finger objects without difficulty. (R. at 122.) He opined that she might have some difficulty driving and should not be expected to drive a vehicle with a clutch. (R. at 122.) He also opined that she could not climb. (R. at 122.) Dr. Peterson diagnosed severe arthritis of the left ankle with a milder arthritis in the right ankle. (R. at 122.) He noted that Harbour's prognosis for recovery of left ankle function was poor, aside from ankle replacement, which he was not qualified to comment upon. (R. at 123.) Dr. Peterson ordered x-rays of Harbour's left ankle and both feet. (R. at 124.) X-rays of the left ankle revealed marked deformity of the talocalcaneal articulation with possible fusion of the talocalcaneal joint. (R. at 127.) X-rays of the right foot revealed some deformity of the talocalcaneal articulation posteriorly, and x-rays of the left foot revealed marked deformity of the talocalcaneal articulation possibly related to an old posttraumatic and postoperative deformity with possible fusion . (R. at 128-29.)

On November 30, 2004, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Harbour suffered from a nonsevere anxiety-related disorder and a nonsevere personality disorder. (R. at 130-42.) He found that she was not restricted in her activities of daily living, experienced no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace and had experienced no episodes

-7-

of decompensation. (R. at 140.) Milan found Harbour's subjective allegations to be only partially credible. (R. at 142.) These findings were affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on March 23, 2005. (R. at 130.)

The same day, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Harbour could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of three hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that she was limited in her ability to push and/or pull foot controls with her ankles. (R. at 143-49.) Dr. Johnson opined that Harbour could never climb, could occasionally stoop, kneel, crouch and crawl and could frequently balance. (R. at 145.) He imposed no manipulative, visual or communicative limitations. (R. at 145-46.) Dr. Johnson found that Harbour should avoid all exposure to hazards, such as machinery and heights. (R. at 146.) Dr. Johnson noted that Dr. Peterson's findings differed significantly from his own findings. (R. at 147.) However, he further noted that Dr. Peterson was a one-time examining source and that his opinions were not entitled to controlling weight. (R. at 147.) Dr. Johnson found Harbour's subjective allegations to be only partially credible. (R. at 148.) These findings were affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on March 22, 2005. (R. at 148.)

The record shows that Harbour received mental health treatment and counseling at Piedmont Community Services from March 15, 2004, through January 19, 2006. (R. at 150-70, 179-206.) On March 15, 2004, Harbour noted symptoms of anxiety as

-8-

evidenced by panic attacks upon attempting to go out, trembling, difficulty being around others and racing thoughts. (R. at 168, 170.) These difficulties began after she was laid off from her job of 24 years in September 2002. (R. at 168.) She also stated that she planned to end her relationship with her alcoholic boyfriend. (R. at 168.) Harbour requested medication, but was encouraged to try cognitive approaches first. (R. at 170.) She was diagnosed with adjustment disorder with mixed anxiety and depressed mood. (R. at 166.) Her prognosis was rated as fair. (R. at 169.) On April 9, 2004, she informed Gail Banks, a licensed clinical social worker, that she had obtained an antidepressant from Community Health Clinic. (R. at 164.) Harbour saw Dr. P.C. Patel, M.D., a psychiatrist at Piedmont Community Services, on May 4, 2004. (R. at 161-63.) Dr. Patel noted that Harbour had been taking Lexapro for approximately one month and was doing fairly well. (R. at 161.) Harbour reported no then-current depression, suicidal or homicidal thoughts, psychosis, mania, no history of suicide attempt and no panic attacks, but underlying dependent needs and underlying personality disorder mixed type and chronic anxiety and nervousness. (R. at 161.) Dr. Patel noted that Harbour was alert, oriented and ambulatory with appropriate mood, thought and affect. (R. at 161.) She was not overtly depressed. (R. at 161.) Harbour's thought processes were logical, and Dr. Patel noted no delusions. (R. at 161-62.) He deemed her judgment as fair, insight as superficial, memory functioning as intact, and he opined that she was of average intelligence. (R. at 162.) He noted that her behavior, orientation, mood, affect, thought process, thought content and perception were within normal limits. (R. at 163.) Dr. Patel rated Harbour's symptoms as a one on a scale of zero to 10, with zero being none and 10 being extreme. (R. at 163.) He rated her side effects to medication as zero, and he rated her overall functioning as eight, with zero being poor and 10 being excellent.

(R. at 163.)  Dr. Patel diagnosed anxiety disorder, not otherwise specified, rule out depressive disorder, not otherwise specified, personality disorder, not otherwise specified, and he assessed a Global Assessment of Functioning, ("GAF"), score of 68-70.[4]  (R. at 162.)  Dr. Patel advised Harbour to continue counseling and medication. (R. at 162.)

On June 15, 2004, it was noted that Harbour was doing "real good" on Lexapro. (R. at 159.)  Her behavior, orientation, mood, affect, thought processes, thought content and perception were within normal limits.  (R. at 159.)  Her symptoms were rated as one, her medication side effects as zero and her overall functioning as eight. (R. at 159.)  On August 26, 2004, Harbour's behavior, orientation, mood, affect, thought process, thought content and perception were within normal limits.  (R. at 155.)  Her symptoms were rated as a one, her medication side effects as zero and her overall functioning as eight.   (R. at 155.)   Again, in October 2004, Harbour's symptoms were rated as one, her medication side effects as zero and her overall functioning as between a seven and eight.  (R. at 153.)  On December 14, 2004, it was noted that Harbour was depressed, but her symptoms again were rated as a one, her medication side effects as zero and her overall functioning as between a seven and an eight.  (R. at 151.)  At her visit on February 15, 2005, her symptoms were rated as a one and her medication side effects as a zero.  (R. at 150.)  She was diagnosed with depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified,

_____

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  A GAF score of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

-10-

and personality disorder, not otherwise specified. (R. at 150.) On May 17, 2005, it was noted that Harbour was depressed and anxious. (R. at 199.) However, her symptoms were rated as a one, her medication side effects as a zero and her overall functioning as between a seven and an eight. (R. at 199.) Her diagnoses remained unchanged. (R. at 199.) On August 9, 2005, she was again deemed to be anxious and depressed. (R. at 200.) The only difference being that her symptoms were rated as between a one and a two. (R. at 200.) On September 30, 2005, Banks noted that Harbour's medication was "doing okay." (R. at 202.) On November 11, 2005, Harbour was depressed and anxious again. (R. at 203.) Her symptoms were rated as a one, her medication side effects were rated as a zero and her overall functioning was rated as between a seven and an eight. (R. at 203.) Harbour's diagnoses remained unchanged. (R. at 203.)

In a letter dated January 26, 2006, Dr. Patel stated that Harbour had very limited coping skills along with significant anxiety and depressive symptomatology. (R. at 208.) He opined that she would likely deteriorate in a complex work environment where she had to tend to stressful work situations. (R. at 208.) Dr. Patel further opined that Harbour likely would not be able to secure gainful employment for at least the following twelve months. (R. at 208.)

On April 26, 2005, Harbour again saw Dr. Tucker for an evaluation of her left foot. (R. at 176.) Dr. Tucker noted continued pain and swelling of the left foot and ankle. (R. at 176.) He noted that Harbour had developed a significant amount of subtalar joint arthritis since undergoing a calcaneal navicular bar resection approximately 15 years previously. (R. at 176.) Dr. Tucker further noted that

-11-

Harbour had a spastic peroneal spasm and splinting of the subtalar joint as mentioned in the previous note from December 2003. (R. at 176.) He found limitation of motion of the left subtalar joint with pain to palpation over that area. (R. at 176.) Dr. Tucker diagnosed continued arthritis in the subtalar joint with peroneal spasm, and he advised Harbour to limit her walking as much as possible, but he noted that she eventually would likely have to undergo a subtalar joint fusion. (R. at 176.)

Harbour again saw Dr. Tucker on January 6, 2006. (R. at 177.) Dr. Tucker noted that the talus, on x-ray, appeared almost totally collapsed. (R. at 177.) He diagnosed severe degenerative joint disease of the left foot with severe osteoarthritis. (R. at 177.) Dr. Tucker advised Harbour to ambulate as comfortably as possible, but again noted that she eventually would need to undergo surgery. (R. at 177.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the claimant: 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

-12-

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairment. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053( 4th Cir. 1980).

By decision dated June 21, 2006, the ALJ denied Harbour's claims. (R. at 15-21.) The ALJ found that the medical evidence established that Harbour had a severe impairment, namely arthritis, but he found that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1. (R. at 17-18.) The ALJ found that Harbour had the residual functional capacity to perform sedentary work, diminished by an ability to stand/walk for only two hours in an eight-hour day and an inability to crouch, climb or drive. (R. at 19.) Thus, he found that Harbour was unable to perform any of her past relevant work. (R. at 19.) Based on Harbour's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Harbour could perform, including those of a telemarketer and an order clerk. (R. at 19-20.) Thus, the ALJ concluded that Harbour was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 20-21.)

-13-

*See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

In her brief, Harbour argues that the ALJ erred in failing to find that she suffered from severe mental impairments. (Plaintiff's Brief In Support Of Motion for Summary Judgment, ("Plaintiff's Brief"), at 5-10.) Harbour also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 11-15.) She finally argues that the ALJ erred by improperly considering her allegations of pain. (Plaintiff's Brief at 15-16.)

A.    *Mental Impairments*

1.    *Severity of Harbour's Mental Impairments*

Harbour first argues that the ALJ erred in failing to find that she suffered from severe mental impairments. (Plaintiff's Brief at 5-10.) Specifically, she argues that the ALJ erred by rejecting the opinion of her treating psychiatrist, Dr. Patel, without sufficient explanation therefor. Based on my review of the evidence, I find that substantial evidence supports the ALJ's finding that Harbour did not suffer from severe mental impairments.

I first will address Harbour's contention that the ALJ improperly rejected Dr. Patel's January 26, 2006, letter stating that Harbour could not find substantial gainful employment for at least 12 months based on her very limited coping skills along with significant anxiety and depressive symptomatology in determining that she did not suffer from severe mental impairments. (R. at 208.) Dr. Patel opined that Harbour likely would deteriorate in a complex work environment where she had to tend to

-14-

stressful work situations.  (R. at 208.)  In his decision, the ALJ stated that he had considered the medical records of Dr. Patel, "and in particular his opinion, in January 2006 ... and accord little weight to the same, as that opinion is contradicted by the treatment notes from Piedmont Community Services ... which indicate amelioration of her symptoms, with fair[l]y good ability to function, as she is ranked at '7-8' on the functioning scale out of '1-10', with '0' being ... poor and '10' being excellent."  (R. at 18-19.)  Thus, contrary to Harbour's allegation, the ALJ sufficiently explained why he was according little weight to Dr. Patel's January 2006 letter.  That being the case, the question then becomes whether substantial evidence supports the ALJ's weighing of the evidence and ultimate finding that Harbour did not suffer from severe mental impairments.  For the reasons that follow, I find that it does.

        As the ALJ stated in his decision, Dr. Patel's January 2006 letter is not supported by his own treatment notes.  In particular, Dr. Patel noted in May 2004 that Harbour was doing "fairly well" on Lexapro, which she had been taking for approximately one month.  (R. at 161.)  Harbour reported no then-current depression, and Dr. Patel found her mental status examination to be within normal limits.  (R. at 161-63.)  In June and August 2004, Harbour's mental status examination was within normal limits, with her symptoms rated as one, medication side effects as zero and overall functioning as eight.  (R. at 155-59.)  In June 2004, it was noted that Harbour was doing "real good" on Lexapro.  (R. at 159.)  Even though Harbour was anxious and depressed in December 2004, May 2005, August 2005 and November 2005, her symptoms were rated as, at worst, a one to two, medication side effects as zero and overall functioning as seven to eight.  (R. at 151, 199-200, 203.)  In February 2005, Dr. Patel diagnosed Harbour with a depressive disorder, not otherwise specified, an

-15-

anxiety disorder, not otherwise specified, and a personality disorder, not otherwise specified. (R. at 150.) In September 2005, Dr. Patel again noted that Harbour's medication was "doing okay." (R. at 202.) None of the treatment notes from Piedmont Community Services reflect that any limitations or restrictions were imposed on Harbour's work-related mental abilities. Thus, as the ALJ stated in his decision, Dr. Patel's January 2006 letter is inconsistent with, and contradicted by, his own treatment notes. That being the case, I find that substantial evidence supports the ALJ's decision to accord little weight to Dr. Patel's January 2006 letter.

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2007). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2007). The Fourth Circuit held in *Evans v. Heckler*, that "'[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted). As stated above, treatment notes from Dr. Patel, Harbour's treating psychiatrist, indicated that she suffered next to no symptoms even during the visits that Dr. Patel noted that Harbour was anxious and/or depressed. (R. at 151, 199-200,

-16-

203.)  Likewise, her overall functioning was consistently rated as at least between a seven and an eight on a 10-point scale, with 10 being excellent. (R. at 151, 199-200, 203.)  Mental status examinations were consistently within normal limits, and it was noted on more than one occasion that Lexapro helped to control Harbour's symptoms. (R. at 155, 159, 161, 163, 202.)  It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling."  *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).  The ALJ's finding is further supported by the findings of the state agency psychologists, who concluded that Harbour suffered from a nonsevere anxiety disorder and a nonsevere personality disorder.  (R. at 130-42.)  They found that she was not restricted in her activities of daily living, experienced no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace and had experienced no episodes of decompensation.  (R. at 140.)  Finally, I note that the ALJ's finding that Harbour did not suffer from severe mental impairments is supported by her own account of her abilities, including paying bills, counting change, handling a savings account, using a checkbook/money orders, talking on the phone and/or visiting with others daily, going to the grocery store weekly, getting along with others and getting along well with authority figures.  (R. at 95-98.)

For all of these reasons, I find that the record shows that Harbour's mental impairments have no more than a minimal effect on her work-related abilities.  That being the case, I further find that substantial evidence supports the ALJ's finding that she did not suffer from any severe mental impairment.

## 2.     Mental Residual Functional Capacity

Harbour next argues that the ALJ erred in his mental residual functional capacity finding. (Plaintiff's Brief at 11.) I disagree. As outlined above, the state agency psychologists found that Harbour suffered from a nonsevere anxiety-related disorder and a nonsevere personality disorder. (R. at 130-42.) They further found that she was not restricted in her activities of daily living, experienced no difficulties maintaining social functioning or maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 140.) The state agency psychologists found Harbour's subjective allegations only partially credible. (R. at 142.) Harbour also received treatment from Piedmont Community Services, which included treatment by Dr. Patel, a psychiatrist. These treatment notes reveal that Harbour did well on antidepressant medication. (R. at 159, 161, 202.) She was diagnosed with depressive disorder, not otherwise specified, adjustment disorder with mixed anxiety and depressed mood, anxiety disorder, not otherwise specified, and personality disorder, not otherwise specified, and her GAF score was assessed at 68 to 70, indicating no more than some mild symptoms. (R. at 150, 162, 166.) Also as outlined above, throughout her treatment with Piedmont Community Services, her symptoms were deemed to be mild, at most, and her overall functioning consistently was rated as good, at the very least. Although Dr. Patel's January 2006 letter stated that Harbour had very limited coping skills along with significant anxiety and depressive symptomatology, his treatment notes simply do not support such a finding. Dr. Patel further opined that Harbour would likely deteriorate in a complex work environment where she had to tend to stressful work situations. Even assuming that this would be true, the vocational expert enumerated entry level jobs that were

-18-

relatively simple and nonstressful that existed in significant numbers in the national economy that such an individual could perform.

For all of these reasons, I find that substantial evidence supports the ALJ's decision not to impose any restrictions on Harbour's mental residual functional capacity. In any event, the vocational expert enumerated jobs that allow for the only plausible mental limitations contained in the record, namely difficulty dealing with the public and stressful situations and difficulty performing complex work.

B.    *Physical Impairments*
     1.    *Physical Residual Functional Capacity*
          a.    *Limitations Imposed by State Agency Physicians*

Harbour also argues that the ALJ erred in his physical residual functional capacity finding. (Plaintiff's Brief at 11-15.) Specifically, she contends that the ALJ erred by not specifically including the limitations imposed by the state agency physicians and for failing to explain his apparent rejection thereof. (Plaintiff's Brief at 11-12.) The ALJ found that Harbour had the residual functional capacity for a limited range of sedentary work, allowing for an ability to lift and/or carry items weighing up to 10 pounds, stand/walk for only two hours in an eight-hour day, sit for eight hours in an eight-hour day and an inability to crouch, climb or drive. (R. at 19.) Harbour argues that the ALJ erred by failing to include limitations found by the state agency physicians, including an inability to sit for more than six hours in an eight-hour workday, a limited ability to push/pull foot controls with the lower extremities, an ability to only occasionally stoop, kneel and/or crawl and a need to avoid all

-19-

exposure to work hazards, including heights and machinery. (Plaintiff's Brief at 11-13.)

It is true that the ALJ did not explicitly list all of the limitations found by the state agency physicians in his formal physical residual functional capacity finding. However, as the Commissioner argues in his brief, I find that it was not necessary for the ALJ to do so since he did specifically find that she could perform a limited range of sedentary work. According to Social Security Ruling, ("SSR"), 83-10, the residual functional capacity determines a work capability that is exertionally sufficient to allow the performance of at least *substantially all* of the activities of work at a particular exertional level, but is also insufficient to allow the substantial performance of work at greater exertional levels. *See* S.S.R. 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991, (West 1992). Social Security Ruling 83-10 defines "substantially all activities" as nearly all or essentially all of the activities required in an exertional level of work. *See* S.S.R. 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Thus, the court notes that it is not necessary that an individual be able to perform each and every activity within an exertional level in order to be deemed capable of performing that exertional level of work.

Sedentary work is defined in the regulations as work that involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying of items such as docket files, ledgers and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary

-20-

criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2007). Social Security Ruling 83-10 defines "occasionally" as occurring from very little up to one-third of the time, and states that since being on one's feet is required occasionally at the sedentary level, periods of standing or walking should generally total no more than about two hours in an eight-hour workday, and sitting should generally total approximately six hours in an eight-hour workday.

### i. *Sitting Restriction*

All of the above being said, while the ALJ stated in his residual functional capacity finding that Harbour could sit for eight hours in an eight-hour workday, a finding which, for the reasons cited in the Commissioner's brief, appears to be supported by substantial evidence of record, the very definition of sedentary work does not require an individual to sit for eight hours in an eight-hour workday, but generally six hours in an eight-hour workday, the precise limitation made by the state agency physicians. Therefore, the ALJ's finding that Harbour could sit for eight hours in an eight-hour workday is, at most, harmless error not requiring remand. Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error. *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va., Oct. 18, 2007) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001)) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") Here, the very definition of sedentary work, even further restricted

-21-

by the ALJ's finding that Harbour could perform only a *limited range of sedentary work*, clearly would not require Harbour to sit for more than approximately six hours in an eight-hour workday.

### ii.    Pushing/Pulling of Foot Controls

Harbour also challenges the ALJ's failure to include in his formal residual functional capacity finding her limited ability to push and/or pull foot controls with her lower extremities.  Again, I find this argument to be without merit.  Social Security Ruling 83-10 makes clear that a job falls within the *light* exertional level when it involves sitting most of the time *but with some pushing and pulling of arm-hand or leg-foot controls*, which require greater exertion than in sedentary work.  *See* S.S.R. 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).  That being said, it is clear that sedentary work does not require the pushing and pulling of leg-foot controls and, therefore, the ALJ's failure to specifically list such a limitation in his formal residual functional capacity finding is, again, nothing more than harmless error.

### iii.    Stooping, Kneeling and Crawling

Next, Harbour argues that the ALJ erred by failing to include her ability to only occasionally stoop, kneel and/or crawl in his residual functional capacity finding. Once again, I disagree.  Social Security Ruling 85-15 clarifies that stooping, kneeling, crouching and crawling are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending.  *See* S.S.R. 85-15,

-22-

WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991, (West 1992). Social Security Ruling 85-15 further clarifies that some stooping, which is defined as bending the body downward and forward by bending the spine at the waist, is required to do almost any kind of work, particularly when objects below the waist are involved. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). That Ruling further states that if a person can stoop occasionally, meaning from very little up to one-third of the time, as the state agency physicians opined in Harbour's case, in order the lift objects, the sedentary and light occupational base is virtually intact. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Moreover, SSR 85-15 states that crawling on the hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Social Security Ruling 85-15 proceeds to state that the same would be true of kneeling, which is defined as bending the legs at the knees to come to a rest on one or both knees. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). All of this being the case, the ALJ's failure to specifically include these postural limitations in his formal residual functional capacity finding constitutes, at most, harmless error not requiring remand. As noted above, the vocational expert was asked to assume a hypothetical individual who could perform a limited range of sedentary work, thereby encompassing all of these restrictions. The vocational expert found, that such an individual could perform jobs existing in significant numbers in the national economy.

-23-

Next, Harbour argues that the ALJ erred by failing to specifically include in his formal residual functional capacity finding her need to avoid all exposure to work hazards, including heights and machinery.  As with her previous arguments, I find this to be without merit.  According to SSR 85-15, an individual who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.  *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).  Further, according to SSR 96-9p, the "hazards" defined in the Selected Characteristics of Occupations, ("SCO"), are considered unusual in unskilled sedentary work.  *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 2007 Supp. Pamphlet (West 2007).  These "hazards" include, among other things, moving mechanical parts of equipment, tools or machinery and working in high, exposed places.  *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 2007 Supp. Pamphlet (West 2007).  Social Security Ruling 96-9p further clarifies that even a need to avoid all exposure to such conditions would not, by itself, result in a significant erosion of the occupational base.  *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 2007 Supp. Pamphlet (West 2007).  That being the case, I cannot find that the ALJ committed reversible error requiring remand due to his failure to specifically include this environmental restriction in his formal residual functional capacity finding.

*b.* *ALJ's Failure to Explain Rejection*

I further note that Harbour's argument that the ALJ failed to explain his apparent rejection of these abovementioned findings by the state agency physicians is without merit. For all of the reasons stated above, the ALJ did not reject these findings. He simply did not specify them in his residual functional capacity finding. Further, given that the ALJ found that Harbour could perform a limited range of sedentary work, he did not, in fact, reject these findings. Instead, he accepted them, as they are encompassed by the definition of sedentary work.

*c.* *Bilateral Foot Impairments*

Next, Harbour argues that the ALJ erred by failing to consider the effects of her bilateral foot impairments on her physical residual functional capacity. For the following reasons, I disagree. I first note that the ALJ not only considered her bilateral foot impairments, but he found that they were severe by concluding that she suffered from severe arthritis. I further find, for all of the reasons that follow, that the ALJ's physical residual functional capacity finding accommodated all of the limitations supported by the objective medical evidence as a result of these ankle impairments. Harbour notes in her brief that she testified at her hearing that, due to her bilateral ankle impairment, she could stand and/or walk for only 15 minutes without interruption and that she must constantly elevate her legs throughout the day. (Plaintiff's Brief at 12.) Harbour is correct in noting that the vocational expert testified that there would be no jobs that an individual who had to elevate her feet to waist level during the day could perform. (R. at 235.) However, it has been held that

an ALJ is not required to credit a vocational expert's response to a hypothetical question where such testimony is predicated solely on a claimant's subjective complaints. *See Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987). Such is the case here. No treating or examining physician imposed a requirement that Harbour elevate her legs at all, let alone to waist level. The only limitations placed on Harbour as a result of her bilateral ankle impairments were those by the state agency physicians, namely that she could stand and/or walk for two hours in an eight-hour workday, that she would have difficulty walking on uneven terrain, but could be expected to walk short distances of less than 20 yards occasionally as part of her work, that she could carry items weighing up to 10 pounds, that she could not crouch due to difficulty moving her left ankle, that she could not climb and that she might have some difficulty driving and should not be expected to drive a vehicle with a clutch, and the statement by Dr. Peterson that she should stay off of the foot[5] as much as possible, but ambulate comfortably. (R. at 120, 122.) No treating or examining source opined that Harbour needed to elevate her feet at all. Moreover, contrary to Harbour's argument, the ALJ did consider her difficulty standing and walking, by limiting her to standing and walking no more than a total of two hours in an eight-hour workday.

While Harbour notes that the ALJ did not even mention the findings of Dr. Tucker, as the Commissioner argues, the treatment notes of Dr. Tucker are consistent with those of Dr. Peterson, whose treatment notes the ALJ discussed in detail. Thus, while the better course of action for the ALJ would have been to include some discussion of Dr. Tucker's findings, his failure to do so does not constitute reversible

---

[5]Dr. Peterson evaluated only Harbour's left foot.

-26-

error requiring remand.

2.      *Pain Analysis*

Lastly, Harbour argues that the ALJ improperly considered her subjective allegations of pain. (Plaintiff's Brief at 15-16.) Yet again, I disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be some objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers. ...

76 F.3d at 595.

Here, the ALJ, in his decision, specifically stated that he "f[ou]nd[] that the

-27-

claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms [were] not entirely credible." (R. at 18.) The first prong of the pain analysis having been met, the ALJ simply found that the objective medical evidence of record did not support Harbour's subjective allegations regarding her symptoms. It is well-settled that an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Credibility determinations as to a claimant's testimony regarding her pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90.

Here, given the limitations imposed upon Harbour by Dr. Tucker, Dr. Peterson and the state agency physicians, all outlined above, I find that the ALJ properly considered Harbour's subjective allegations and that substantial evidence supports his finding that those allegations were not supported by the objective medical evidence of record.

Based on the above, I find that substantial evidence exists in this record to support the ALJ's finding that Harbour was not disabled, and I recommend that the court deny Harbour's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying an award of DIB and SSI benefits.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Substantial evidence exists in the record to support the Commissioner's finding as to Harbour's mental residual functional capacity;

2.      Substantial evidence exists in the record to support the Commissioner's finding as to Harbour's physical residual functional capacity; and

3.      Substantial evidence exists in the record to support the Commissioner's finding that Harbour was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny Harbour's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying an award of DIB and SSI benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A.

§ 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      This 27th day of May 2008.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-30-